Sanders, Janet L., J.
This case arises from a so-called “foreclosure rescue scheme” whereby a number of individuals exploited distressed homeowners on the verge of losing their homes. With the partial complicity of the homeowners, these individuals arranged bogus sales so as to fraudulently obtain mortgages from lending institutions. The homeowners ended up losing their houses to foreclosure, while those who put together and assisted in the deals lined their pockets. The Commonwealth instituted this action seeking damages and civil penalties against the wrongdoers. In the meantime, the country is still paying the price for schemes like this one.
Initially, this case involved nineteen defendants who participated in various aspects of the scheme. They included mortgage brokers, real estate brokers, “straw” buyers, and closing attorneys. By the time this case came before the Court for a jury-waived trial, eleven defendants had settled with the Commonwealth.[2] Seven defendants had been defaulted.[3] The sole remaining defendant was James Alberino, a Boston real estate lawyer who has since been suspended from the Bar and now works at a Marblehead gym.
The case against Alberino focused on his involvement with one defendant in particular, Leo Desire, Sr. Both Desire and Alberino asserted the Fifth Amendment to key questions at trial. But other witnesses described how the scheme worked. Based on that testimony together with the adverse inferences I draw from Alberino’s invocation of his Fifth Amendment right not to incriminate himself, see Wansong v. Wansong, 395 Mass. 154, 157 (1985), this Court makes the following findings and rulings in support of its order of judgment against Alberino.
FINDINGS OF FACT
The scheme’s mastermind was Desire, a mortgage broker who operated through several different entities. At the time of events in this case, those entities included defendants Home Pride Management (“Home Pride”), Primaiy Mortgage Resources, Inc. (“PMR”) and Universal Plus Realty & Financial Services, Inc. (“Universal Plus”). Alberino first met Desire when Desire was working as broker for an Everett company in the 1990s. First admitted to the bar in 1977, Alberino was a solo practitioner with a concentration in real estate work. Desire began to refer closings to Alberino.
In the late 1990s, Alberino began assisting Desire in other matters. For example, he helped him form a corporation called KekokaTahari, Inc., its sole director being Desire’s then wife. In 2003, the year before the transactions at issue in this case, Alberino issued checks totaling over $126,000 to KekokaTahari from his IOLTA account — checks which Desire caused to be deposited in Universal Plus’s bank account. By 2004, 25 percent of Alberino’s real estate closings were referred to him by PMR, Desire’s mortgage brokerage firm. During this same period, money in the form of checks continued to flow between Alberino and Desire. Although there was no specific evidence that this activity was illegal, it did show that the relationship between the two was a close one and of some mutual financial benefit.
The instant case involves transactions relating to two pieces of property. One was a home located at 26 Charles Street in Natick (the “Charles Street Property”). It was owned by Maureen Stretch, herself a lawyer. The second was a home located at 11 Welling *66 ton Street in Methuen (the “Wellington Property”). It was owned by Lisa and James Turgeon. Stretch and Lisa Turgeon both testified at trial. Their testimony, which I find to be largely credible, described how they became involved with Desire and Alberino.
Stretch bought the Charles Street Property in 1979 for about $50,000. She refinanced it twice to pay off debts. By 2000, she was again in financial trouble, and started missing her mortgage payments. This time, she was unable to refinance. By 2003, Stretch had already staved off foreclosure twice. She owed more than $50,000 in back taxes, and was facing foreclosure for a third time. Stretch consulted an attorney about filing for bankruptcy but was told she did not qualify. The attorney referred her to Desire, whom she met with in late 2003 or early 2004.
Desire described for Stretch a “Trust Program” whereby she would convey her house into a trust for a year. She was told that some portion of the sales proceeds would be placed into an escrow fund, to be used to make the monthly payments on the mortgage obtained by a straw buyer to fund the sales price. In addition to having her mortgage on her home paid off, Stretch would receive approximately $50,000 in cash from the sale, which she could use to pay off her debts. After a year and with her credit improved, Stretch would be in a position to buy back the house, Desire promising to assist her in obtaining a new mortgage. Throughout this period, Stretch would continue to live in the Charles Street Property.
Lisa Turgeon described a similar series of events. She had bought the Wellington Property in 1999 with a mortgage that financed 100 percent of the $50,000 sales price. Her husband was only sporadically employed, however, and the couple almost immediately fell behind on their mortgage payments. Like Stretch, the Turgeons explored the possibility of bankruptcy, but their successive petitions were dismissed. Their bankruptcy attorney said Desire might be able to assist them; he introduced them to someone who represented Desire in late 2003. This representative told the Turgeons about the same “Trust Program” that had been described to Stretch: not only would their old mortgage get paid off but they would get cash in hand. After a year, the couple could buy their house back with Desire’s assistance, all while they remained in their home.
The closing on the Charles Street Property took place on March 19,2004. Stretch went to the law office of Alberino, who she understood was going to handle the closing. Desire was not present. Instead, she was introduced to two men whom she had never met, Louis Joseph and his son Robens Joseph. Robens Joseph had been recruited by his father and Desire to participate in the deal in return for $5,000. He had no intention of actually taking possession of the property or becoming obligated to pay the mortgage on it.
Although Stretch had never met the Josephs before the closing, a few months before, she had signed what she regarded as a “trust document” but what was in fact a purchase and sales agreement (the “P&S”). That P&S, dated January 23, 2004, named Robens Joseph as the “buyer” of the Charles Street Property and stated a sales price of $329,000, with a $65,000 deposit. In fact, no deposit had been paid, and there was no evidence presented to this Court to substantiate the sales price. There were other statements in the P&S that Stretch knew to be false. For example, it said that the Charles Street Property was to be delivered to the Buyer (Joseph) “free of tenants” even though Stretch was to remain in the home. It listed a three percent brokerage fee payable to “Universal Plus,” but Stretch had not placed her house on the market or hired any broker.
At the closing, Alberino presented Stretch with two documents. One was a Settlement Statement prepared by Alberino. The Settlement Statement listed the same $329,000 sale price, together with the $65,000 deposit that had never been made. The Settlement Statement also stated that the “Buyer” (Robens Joseph) was paying $10,441.24 to Stretch at the closing when in fact Joseph brought no cash to the closing. The Settlement Statement said that Stretch was receiving $81,527.71 in cash; that too was a false statement. Instead, Alberino gave Stretch a check for $48,507.84.
Some portion of the sales proceeds was used to pay Stretch’s $155,00 mortgage with Wells Fargo. Other payments went to various lawyers, including' Eric Rothenberg, who had obtained a mortgage on Stretch’s house that February, apparently in return for legal advice. Alberino’s legal fee was also deducted. Universal Plus received an $8,897 brokerage fee even though no work had been done. PMR received a three percent “loan origination” fee. Alberino wrote checks for both these amounts, which were ultimately deposited in a PMR account. In other words, everyone got a piece of the purchase price for the property — and that price was to be paid by the lending institution based in part on the Settlement Statement.
Stretch signed the Settlement Statement certifying that it was “true and accurate.” She knew it was not. Alberino as Settling Agent also signed, certifying that “I have prepared a true and accurate account of this transaction [and] I have caused or will cause the funds to be disbursed in accordance with this statement.” In fact, Alberino knew that the Settlement Statement contained multiple false statements and that the funds were not being disbursed as it described. That is, he knew the buyer made no cash payment at closing, knew or should have known that no deposit was made on the Property, and knew that Stretch did not receive that amount of the sales proceeds set forth in the Settlement Statement. Alberino prepared the Settlement Statement knowing that the lending insti *67 tution that was funding the transaction would rely on it.
The second document that Alberino presented to Stretch was a short typewritten statement that Al-berino prepared. Unlike the Settlement Statement, Alberino had no intention of presenting this document to the lender. This second document authorized Al-berino to deduct from the sales proceeds Joseph’s “closing costs” of $10,441.24 (that amount the Settlement Statement said Robens Joseph had paid in cash to Stretch) as well as $22,579.20. The latter amount was what Stretch believed was going into an escrow account and which would be used to pay the mortgage that was being taken out to finance the bogus sale. Both Alberino and Stretch signed this document. On the same day as the closing, Alberino wrote a check to “Home Pride” in the amount of $22,579.20. That check was deposited into the account of Universal Plus.
The Turgeons’ closing proceeded in similar fashion. Like Stretch, Lisa and James Turgeon entered into a Purchase and Sale Agreement with a straw buyer, this one by the name of Paul Joseph. For the closing on March 1, 2004, the Turgeons went to Alberino’s office. Desire was in attendance. Alberino gave them a HUD Settlement Statement and described it in general terms. The Settlement Statement listed a sales price for the Wellington Property in the amount of $292,000. Turgeon said she had no idea how that amount was determined; indeed, she had not attempted to sell the Wellington Property because she was afraid it was not worth more than the $155,000 mortgage she already had on it. The Settlement Statement also listed a deposit of $43,800 from the buyer, even though no deposit was ever made. It stated that the Buyer made cash payment of $10,102.98 to the Turgeons; that too was false. Finally, the Settlement Statement said that the Turgeons received $42,311.19 from the sale, when in fact they received a check from Alberino in the amount of $33,848.54. The Turgeons nevertheless signed the Settlement Statement certifying that it accurately set forth all charges. So did Alberino as the Settlement Agent. He did so knowing that it contained several false statements and that the lender would rely on it in issuing a mortgage to the supposed buyer Paul Joseph.
Like Stretch, the Turgeons had their outstanding mortgage paid off as a result of the transaction. There were other deductions they did not entirely understand, however. For example, Universal Plus charged them a brokerage fee of $8,760, even though they had never had the house on the market. The check that Alberino wrote to Universal Plus for this amount was deposited in an account of PMR, Desire’s mortgage firm. The Settlement Statement listed a loan origination fee totaling $4,964 for PMR; in fact, Alberino wrote a check to PMR for $6,515, deducting that amount from the sales proceeds. The Settlement Statement also reflected that $36,417.98 of the sales proceeds was set aside as “escrow to Home Pride.” Although Lisa Turgeon had never heard of Home Pride, she believed this money was going to pay for Joseph’s mortgage until such time as the Turgeons were able to buy their house back. In fact, Alberino disbursed these funds by depositing $10,017.98 into his own account, with the rest made payable to Home Pride and ultimately deposited into a PMR account. No escrow fund was ever set up.
After signing the Settlement Statement, the Turgeons were presented with a second typewritten document. It authorized Alberino to pay Home Pride a total of $36,417.98 (the amount listed as going in escrow on the Settlement Statement). This second document included Alberino’s handwritten note that the Turgeons authorized him to pay Universal Plus $8,760 (the so-called “brokerage fee”). The Turgeons signed, but driving home afterwards, Lisa Turgeon became concerned that the numbers on the two documents they had signed did not add up; she was also confused as to where the money was going. She called Alberino, who reassured her and promised to see to it that Desire used the so-called escrow money to pay the straw buyer’s mortgage for the first year. That did not happen.
Contrary to representations made to these two sets of homeowners, neither of the two properties was ever placed into trust. No escrow accounts were ever created to pay the straw buyer’s monthly mortgage obligations. Instead, with Alberino’s assistance, the funds flowed to PMR or Desire. Moreover, Alberino assisted PMR and Desire in committing a fraud on the lending institution that granted mortgages to each of the straw buyers. He prepared or assisted in preparing a Settlement Statement for each transaction that he knew contained several false statements of material fact; without these certified Settlement Statements, the lenders would not have disbursed any funds. Knowing that Stretch and the Turgeons would remain in their homes, Alberino had the buyer at each closing sign an “Occupancy Agreement” certifying to the lender that the buyer would live in the property as his primary year-round residence. As an experienced real estate lawyer, Alberino knew that the lender relied on this information in advancing the money for each transaction. Indeed, in each case, he signed off on a set of closing instructions whereby he represented to the lender that the Settlement Statement was accurate, that he had received sufficient cash or other funds from the borrower to cover closing costs, that he had verified that a deposit had been made by the buyer, and that no fees or other charges had been omitted from the Settlement Statement. In fact, all of these representations were false, Alberino knew that at the time he made them, and the lender relied on those representations to its detriment.
The ending to this stoiy is not a happy one. At some point, Stretch got a call from one of the Josephs: he *68 said that Desire was not paying the mortgage on the Charles Street Property and that Stretch needed to pay him rent. Stretch’s attempts to contact Desire were unsuccessful. Ultimately, the Charles Street Property was sold at foreclosure and Stretch now lives in a rented apartment. After the closing on the Wellington Property, the Turgeons did not hear from Desire again. The straw buyer Paul Joseph did assist Lisa Turgeon in locating a lender so she could buy the property back (and relieve Joseph of the mortgage obligations). A few months later, however, she and her husband permanently separated and the house was lost in a foreclosure sale in November 2005.
In 2007, the Board of Bar Overseers began disciplinary proceedings against Alberino. In October 2010, he reached a settlement with the BBO agreeing to an eighteen-month suspension. As part of that settlement, he agreed that all material facts in the Amended Petition for Discipline would be proved by a preponderance of the evidence if there were a hearing. Two of the three counts in that Amended Petition related to his involvement in the Stretch and Turgeon transactions and alleged that he had violated the rules of professional conduct by knowingly making false statements of material fact to his client, the lender in the two transactions.
That lender was “America’s Wholesale Lender,” an arm of Countrywide Mortgage. Countrywide, a sub-prime mortgage lender, and its founder Angelo Mozilo figured prominently in the economic crisis of2008. See Bethany McLean & Joe Nocera, All the Devils Are Here (2010). The loans to the straw buyers were stamped at some point as “Paid in Full.” Countrywide no longer exists.
CONCLUSIONS OF LAW
The Commonwealth alleges that Alberino’s actions violate G.L.c. 93A. Section 2 of that chapter prohibits unfair and deceptive business acts or practices. That has been defined as conduct that falls within “the penumbra of some common law, statutory or other established concept of unfairness” — that is, conduct which is “immoral, unethical, oppressive or unscrupulous.” PMP Assoc., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). In a civil action like this one, the plaintiff bears the burden of proving its case by a preponderance of the evidence. This Court has no difficulty in concluding that the Commonwealth has sustained its burden of proving that the defendant Alberino violated Chapter 93A.
Those violations consist of the multiple acts of dishonesty and deceit that Alberino committed at the closings on the two properties here at issue. That conduct can be broken down into (at least) seven separate acts for each of the two transactions:
a.He knowingly failed to disburse funds in accordance with the Settlement Statement he submitted to his lender client even though he affirmatively represented to his client that he would do so. b. He certified that the Settlement Statement in each transaction was entirely accurate even though he knew that it contained multiple misrepresentations of material fact upon which his lender client would rely to make the loan.
c. He diverted some portion of the seller’s proceeds to Desire and certain Desire-controlled entities (including PMR and Universal Plus) when he knew or had reason to know that they had not performed any services in connection with the transactions.
d. He failed to verify that the supposed buyer in each transaction had actually made a deposit toward the purchase price even though he represented to his lender client that he had done so and reduced the proceeds due the seller by the same amount.
e. He failed to obtain any closing costs from the buyer, even though the Settlement Statement listed an amount paid to the seller in cash for such costs.
f. He obtained a signed occupancy affidavit from each of the buyers, and assisted them in obtaining mortgages, knowing that they never intended to occupy the properties and would not be making monthly mortgage payments.
g. He obtained authorizations from each seller to distribute proceeds other than as reflected on the Settlement Statement and kept this information from his lender client.
All of these violations were knowing and willful.
With regard to the remedy that should be imposed, the Commonwealth asks that the Court assess the maximum penalty of $5,000 for each act that I find to be an unfair and deceptive practice. See G.L.c. 93A, §4. With at least seven such acts committed with respect to each of the two closings, that amounts to a total penalty of $70,000. This Court agrees that the maximum penalty is warranted here, given the egregiousness of the conduct at issue. That the defendant is a lawyer makes his conduct even more reprehensible. I also conclude that the Commonwealth’s request for injunctive relief is appropriate: not only should Alberino be prohibited from future 93A violations of the same type as here but he should also be enjoined from acting as a closing attorney or title agent in any real estate transactions in the Commonwealth.
This Court does not agree with the Commonwealth that the sellers are entitled to compensatory damages, however, whether under a theory of restitution or of disgorgement of profits. Although the Commonwealth has characterized the foreclosure rescue scheme as a way to strip homeowners of their equity, it would be more aptly described as a fraud on the lender. This fraud was committed with the knowing participation of the two homeowners here. Like Alberino, Stretch and the Turgeons knew that the supposed sales of their homes were shams. They knew that the buyers never intended to occupy the property. They knew that *69 the documents they executed for submission to the lender financing the transactions contained multiple false statements of fact. Like Alberino (who received his legal fees), the homeowners received their own share of the proceeds from this fraud: the mortgages that were in default were paid off and they received cash in hand. Certainly, their own complicity in the fraud does not in any way excuse Alberino. It is nevertheless a factor this Court must consider in deciding whether to exercise the broad equitable powers afforded to me by Section 4 of 93A in a way that benefits these homeowners beyond the restitution they have already received from the Attorney General.[4]
There is an additional reason why court-ordered restitution is not appropriate. The Commonwealth calculates restitution based on the assumption that the sales price set for these two pieces of property accurately reflects their value. There was no evidence to support that assumption, however. Certainly, the price was not the result of arms-length transactions, since the buyers were “straws” with no intent of paying on the mortgages obtained to finance the sham deals. It is far more likely that the sales prices were determined by Desire, who had every motive to place a high value on the properties so as to maximize his own return. Although it is certainly possible that the homeowners here did lose some equity, they could have realized that equity if they had decided to sell their homes. Instead they threw their lots in with Desire and company.
CONCLUSION AND ORDER
For all the foregoing reasons, it is hereby ORDERED that judgment enter in favor of the Commonwealth and that the defendant be required to pay a total of $70,000 in civil penalties pursuant to G.L.c. 93A, §4 and that a permanent injunction enter against him in the form proposed by the Commonwealth in paragraph 36 of its Proposed Rulings of Law. The Commonwealth is also entitled to its reasonable attorneys fees and costs. Within fourteen days of receiving a copy of this order, the Commonwealth shall file a motion for such fees with supporting affidavits pursuant to Rule 9A. It shall also submit a proposed Order of Judgment in line with this decision.

The following defendants entered into consent judgments: Leo Desire, Sr. (July 26, 2010); Robin Hayes (October 27, 2010); Neville Francis (October 9, 2009); Valerie Hanserd (June 8, 2009); Jean Roll Joseph (April 23, 2010); Pierre Joseph (July 26, 2010); Robens Joseph (March 30, 2010); Robert Marks (July 28, 2010); Marie Betey Mereus (September 2, 2009); Daphne Mompoint (July 26, 2010); Primary Mortgage Resources, Inc. (July 16, 2010).

h'he defaulted defendants are: Advie Charles, Joel Charles d/b/a Sourie Corp., Leo Desire, Jr., Louis Joseph, Paul Joseph, Home Pride Management, Inc., and Universal Plus Realty & Financial Services, Inc.

The Commonwealth has already paid $23,871.50 to the Turgeons and $29,307 to Stretch from proceeds that it received from those defendants who settled the claims against them.